IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

             **Plaintiff,**

vs.                                        Civ. No.  10-451 JH

LUIS CORDOVA-PONCE and
JOSE SERGIO ALCAYA-VILLALOBOS,

             **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendants' Joint Motion to Suppress Evidence* [Doc. No. 32] and *Defendants' Joint Motion to Suppress Evidence for Violation of Their Rights Under the Fourth Amendment* [Doc. No. 38].   The Government has filed a written response to each of these motions.  See Doc. Nos. 34 and 39.  On September 16, 2010, the Court held an evidentiary hearing on the motions at which both defendants were present.  Art Nieto represented Mr. Cordova-Ponce, while Leroy Duarte represented Mr. Alacaya-Villalobos.  Samuel Hurtado represented the Government.  After considering the testimony offered into evidence at the hearing, the arguments of counsel, as well as the contents of the briefs filed by the parties, the Court concludes that the motions to suppress should be granted in part and denied in part, as further explained below.

## FACTS

For the purposes of this motion, the Court makes the following factual findings.  On January 26, 2010, six agents with the New Mexico State Police went to the defendants' single-wide mobile home at 7 Amber Lane in Taos, New Mexico for a consensual interview, known as a "knock and

talk."[1] Those agents were Eduardo Martinez, Chris Valdez, Joey Gallegos, Abraham Baca, Matthew Martinez, and Gilbert Tafoya.[2] The police were prompted to go to defendants' home by an informant who stated that someone from Mexico who lived at the house was selling cocaine. Eduardo Martinez ("Martinez") was wearing a black shirt with "State Police" written in yellow on the sleeves, black pants, a vest with a badge that said "police" on the chest and back, and a firearm visibly holstered at his side. The other police officers were dressed similarly. The State Police agents arrived at the Defendants' residence in three unmarked police cars, which they parked outside the mobile home.

Agents Martinez and Baca made the initial approach on the mobile home at around 5:40 p.m. Martinez knocked on the door, and Defendant Villalobos answered. Two of the other agents waited in the driveway of the mobile home, while the remaining two agents went around to the side of the house. In what both he and Villalobos described as a "normal tone," Martinez asked Villalobos in English if they could come inside. When Villalobos indicated that he did not speak English, Martinez asked again in Spanish, stating that he was a policeman from Taos and asking if they could come inside. Villalobos said, "Vamonos entrado. Si, pasalo," meaning "Yes, come in." Villalobos moved back, away from the door (which was still open) and into the mobile home's kitchen. At that point, Agents Martinez and Baca entered the home, followed closely by Agent Gallegos, stepping directly into the kitchen. Within a minute, the other agents also entered the house, although they

---

[1] The Tenth Circuit has characterized a "knock and talk" investigation as follows: "As commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment even absent reasonable suspicion." *United States v. De Jesus Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006).

[2] Of these six, only Eduardo Martinez testified at the evidentiary hearing. Accordingly, all references to "Martinez" are to Eduardo Martinez. Agent Matthew Martinez is identified by his full name.

did not ask for permission before doing so. When the agents first entered, the lights were not on in the house, although the room where they entered was illuminated by a large screen television that was on.  Both Martinez and Villalobos agree that there was still some light outside, and that one could see inside the mobile home.  Villalobos walked through the kitchen and into the living room, and the agents followed him.  At that time, Agent Martinez observed a white powdery substance on the kitchen table, along with a box of plastic baggies, rolls of grey duct tape and brown boxing tape, and a single plastic bag.  Based upon his training and experience, Agent Martinez recognized these items as drug packaging materials.  Martinez asked Villalobos if the house had lights.  Villalobos said yes, and at Martinez' request he turned on the lights.  Then, Agent Martinez asked Villalobos if there was anyone else in the home. Villalobos said that his friend was present, and when Martinez asked where he was, Villalobos pointed to a bedroom towards the back of the house.  Then Martinez sent Agent Baca to retrieve Villalobos' friend, but before Baca arrived at the bedroom, Defendant Ponce left the bedroom and walked out to the living room of his own accord.

At that point, Defendant Cordova walked out of the bedroom into the living room.  For officer safety purposes, Agent Martinez directed the two Defendants to sit on the couch, and they complied.  By this point, all six agents were inside the trailer.  Martinez explained to Defendants, again in a normal tone, the reason for the agents' presence at their home, stating that they had information that drugs were being sold out of the house.  At the mention of drugs, the Defendants looked at each other.  Then, Agent Martinez asked them if there were drugs inside the house.  Initially the Defendants denied it.  Agent Martinez asked the question again, pointing out to Defendants the items that he had seen on the kitchen table.  Defendants appeared nervous and looked at each other again.  Then, Villalobos said "pásalo," meaning "pass through," and waved his hand in a sweeping motion in the direction of the rest of the house.  Agent Martinez interpreted

3

this as consent for police to "pass through" or search the house for drugs.  However, Martinez did

not immediately begin a search.  Instead, he asked Villalobos to retrieve any drugs that were in the

house.  The Defendants looked at each other again, and Ponce told Villalobos, "enseñalo," meaning

"show him."  Then, Villalobos stood up and walked to the kitchen, with Agent Martinez following

behind.  Villalobos opened a kitchen cabinet near the refrigerator, reached inside, and pulled out a

box, which he then handed to Agent Martinez.  The box was open, and inside Agent Martinez

observed clear plastic baggies containing a white powder, as well as one clear plastic bag containing

U.S. currency.  In Martinez' training and experience, the items in the box, as well as the items that

Martinez had observed on the kitchen table, were consistent with cocaine trafficking.  At that point,

Martinez asked one of the other agents to handcuff Villalobos.  The agents also handcuffed Ponce

and once again seated both Defendants together on the couch.  After the agents placed the

Defendants in handcuffs, Agent Martinez asked them questions about their identities.  However,

when the two began to talk to each other in Spanish, Martinez ordered the other agents to move

Ponce to the front door, while Villalobos remained on the couch.  One agent was assigned to watch

over each of the Defendants.

The remaining agents spent between forty-five minutes and an hour searching the house

(including both bedrooms, two bathrooms, the closets, the living room, the kitchen, the laundry

room, and the hallway) for illegal drugs, U.S. currency, materials used for packaging drugs, and any

type of drug paraphernalia.  They found numerous packages of clear plastic wrapped in gray duct

tape that were annotated with names and numbers, as well as small pieces of paper with names and

numbers written on them.  In addition, the agents found other clear plastic bags containing white

powder residue, small digital scales, numerous packages of U.S. currency totaling over $24,000,

and cans of acetone, which in Martinez' training and experience is often used as a cutting solvent

for narcotics.  Agent Gallegos field tested the white powder, which indicated that the substance contained cocaine.  In all, the agents seized 193 grams of cocaine from Defendants' home, an amount consistent with distribution of cocaine to others.  Agent Martinez testified that when  he conducts a search for drugs in a residence, he typically begins in the kitchen area because it offers many areas of concealment that are easily accessible.

The agents never read the Defendants their *Miranda* rights while they were at Defendants' home.  However, during that time after they handcuffed the Defendants, the agents asked them how long they had been in the United States, how long they had been selling drugs, and how much they had sold.  From those discussions, which he partially overheard, Martinez understood that the Defendants had been selling drugs in Taos for around four months at a rate of about six ounces per week.  Other agents also asked Defendants questions about possession and ownership of two vehicles parked outside the house.  After stating that the vehicles belonged to them, Defendants gave the officers consent to search the cars.

After the police completed their search of the residence, they transported Defendants to the New Mexico State Police office in Taos.  The agents read Defendants their *Miranda* rights in Spanish and then interviewed them separately, beginning with Villalobos at around 7:40 p.m., two hours after they arrived at Defendants' home.  Agent Martinez handed Villalobos a *Miranda* rights form written in Spanish, which Villalobos read and signed.  Villalobos also told Martinez, in Spanish, that he had understood his rights as set forth on the form.  Then Martinez asked Villalobos questions about the cocaine, such as who it belonged to and what he was doing with it.  Villalobos said that he was selling it and that the cash agents found inside his home was drug proceeds that belonged to him and Defendant Ponce.  Agent Martinez provided Villalobos with a disclaimer form for the money the agents had seized from his home.  By signing the disclaimer form, a suspect states

5

that he does not own or claim to have a right to seized funds, and that he forfeits that money to the government.  Villalobos read the form, which was in Spanish, and then asked Martinez what it meant.  Martinez explained the form to Villalobos, who then stated "I don't want to sign this form. That money is mine."  Martinez' interview of Villalobos lasted approximately ten minutes.

Next, the agents interviewed Defendant Ponce at approximately 7:55 p.m.  They advised him of his *Miranda* rights in Spanish and, as with Villalobos, provided him with a written waiver form explaining his rights.  Like Villalobos, Ponce read the form aloud and then signed the waiver.  Ponce then told Martinez that he and Villalobos were selling the cocaine and that the money the agents found was proceeds from those sales.  Martinez then followed up on what he had overheard Ponce say at the house regarding the amount of time he and Villalobos had been selling drugs.  Martinez asked Ponce how long they had been selling cocaine, and he responded, "I believe four to six months."  Ponce also stated that they had been selling six or seven ounces per week.  Finally, Ponce said that they picked up the cocaine in Albuquerque.  According to Martinez, this information was consistent with the packaging materials and the money that he and other agents found at the Defendants' home.  Martinez further testified that over a period of four months, six ounces per week totals more than 500 grams.  As a result, Defendants have been charged with possession with intent to distribute cocaine (Count II) as well as conspiracy to possess with intent to distribute more than 500 grams of cocaine (Count I).  *See* Doc. No. 2.  Like Villalobos, Ponce refused to sign a disclaimer form regarding the money that police seized from his home, stating that it was his money earned from selling cocaine.

## DISCUSSION

## I.   LEGAL STANDARD

The Fourth Amendment protects citizens from "unreasonable searches and seizures"

conducted by either state or federal government officials.  U.S. Const., amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *see also United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1225 n. 1 (10th Cir. 2008).  In applying these Fourth Amendment's protections, the Supreme Court has recognized "three types of police-citizen encounters[:] '(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.' "  *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996)).  "These categories are not static and may escalate from one to another."  *Cortez v. McCauley*, 478 F.3d 1108, 1115 n. 5 (10th Cir. 2007) (reh'g *en banc*).  "A reviewing court must analyze each stage of the [police-citizen] encounter, ensuring that the requisite level of suspicion or cause is present at each stage."  *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).

"Generally, the defendant has the burden of showing a constitutional infirmity if a search or seizure was carried out pursuant to a warrant.  If, on the other hand, the police acted without a warrant, the burden of proof is on the prosecution."  *United States v. Esser*, 451 F.3d 1109, 1112 (10th Cir. 2006) (internal citations omitted).  Therefore, in this case the Government bears the burden of proving that the seizure and search were reasonable.  *See United States Turner*, 553 F.3d 1337, 1344 (10th Cir. 2009).  Similarly, the Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary.  *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004). "Waiver of one's Fifth Amendment privilege against self-incrimination requires that the individual 'voluntarily, knowingly and intelligently' waive his constitutional privilege."  *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002) (quoting *Miranda v. Arizona*, 384 U.S.

436, 444 (1966)).  "A person who is being detained may still give a voluntary consent, but if the detention is illegal, the government must prove that the primary taint has been purged and that the consent was in fact voluntary. The government's burden is therefore heavier if the detention is illegal." *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (citations omitted).

## II.  CONSENT TO ENTER AND SEARCH THE DWELLING

A warrantless search of a home is presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few limited exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Voluntarily given consent is one such exception. *Id*.  Defendants suggest that Alcaya-Villalobos did not give valid consent to the police to enter the Defendants' home. Consent must be "freely and voluntarily given." *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citations and punctuation omitted).  The Defendants do not suggest that Alcaya-Villalobos lacked authority to grant consent to enter the premises, but rather that his consent was not freely given.  "Whether a [party] freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances." *Pena*, 143 F.3d at 1366 (internal citations and punctuation omitted). The Tenth Circuit has developed a two-part test to guide our inquiry. The government must (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given," and (2) the officers must have used no "implied or express duress or coercion." *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) (citation and internal punctuation omitted).

First, the Court concludes that by stating "pasalo," (meaning pass through, or enter) and stepping aside from the doorway so that officers could enter, Villalobos gave unequivocal and specific consent to the agents to enter the dwelling.  Thus, the remaining question is whether such

consent was freely given without implied or express coercion.

Whether consent is voluntary is a totality of the circumstances inquiry, and Tenth Circuit precedent provides several factors to consider:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or small, enclosed place; and absence of other members of the public.

*United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007) (quoting *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996)). Tenth Circuit cases suggest that the Court should also consider whether the individual was informed of his or her right to refuse consent, *United States v. Orrego-Fernandez*, 78 F.3d 1497, 1505 (10th Cir. 1996), although lack of knowledge is not dispositive. *United States v. Thompson*, 524 F.3d 1126, 1134 (10th Cir. 2008).

Here, there were two officers standing at the doorway when Villalobos answered Martinez' knock. Two more officers were in the driveway, presumably visible to Villalobos as well. Furthermore, Martinez did not inform Villalobos that he had the right to deny the officers consent to enter the home. However, the Court concludes that these facts are outweighed by several other factors that demonstrate that Villalobos' consent was freely given. First, there is no indication that the officers' presence was "threatening." For example, the offices did not brandish their weapons or physically touch Villalobos. Furthermore, only Agent Martinez spoke to Villalobos, and he used a normal, nonthreatening tone, not an aggressive tone. There was no prolonged retention of any of Villalobos' personal effects or interaction in a small or nonpublic place. Rather, the exchange between Martinez and Villalobos occurred while Martinez was standing on the porch, within public

view.  In light of the foregoing, the Court concludes that Villalobos freely gave his consent to the agents to enter his home.

In addition to the their original motion, Defendants make additional arguments in their second motion to suppress [Doc. No. 38] filed on Monday, September 13.  They contend that when confronted with five armed, uniformed police officers inside their home, what may have begun as a consensual encounter became a seizure.  In essence, Defendants argue that when all six armed agents entered their trailer and ordered them to sit on the couch, they had been seized and therefore all of their statements, including their consent to search the premises, were coerced.  They also argue that Alcaya-Villalobos' response, "pasalo" to Martinez's question of he could search the house was non-responsive, therefore weighing in favor of the conclusion that he did not understand the officer's question and therefore did not voluntarily grant consent to search.

The Court concludes that while this presents a somewhat close question, the Defendants were not seized when they were seated on the couch prior to being handcuffed.  As Defendants point out, there were six armed and uniformed police officers in their home, a private space.  Defendants suggest, in part, that because the encounter took place within their home, in which they have a heightened expectation of privacy, they were necessarily seized by the police.  Although Defendants are correct that they had an increased expectation of privacy within their own home, this privacy expectation "has limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate the encounter."  *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994) (noting that an individual's increased expectation of privacy is primarily relevant to the question of the reasonableness of a police search, not to whether an encounter is consensual) (quotation omitted); *see also United States v. Kim*, 27 F.3d 947, 953 (3d Cir. 1994) ("As far as consent is concerned, one may consent to an encounter in the privacy of his own home or in a public

10

square.").  The Tenth Circuit does consider "interaction in a nonpublic place . . . and the absence of other members of the public" as factors pointing toward a nonconsensual encounter.  *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).  The particular location of the encounter, however, is only one factor in the totality of the circumstances test.  *Little*, 18 F.3d at 1503. There is no per se rule that a police encounter within an individual's home is a seizure within the meaning of the Fourth Amendment. *See United States v. Abdenbi*, 361 F.3d 1282, 1288 (10th Cir. 2004) ("[I]t is axiomatic that all requests to search a home or apartment are made in nonpublic places."); *United States v. Jerez*, 108 F.3d 684, 691-92 (7th Cir. 1997) (recognizing that a "knock and talk" is ordinarily consensual unless coercive circumstances exist).

Furthermore, the agents had directed the Defendants to sit on the sofa.  However, it was reasonable for the agents, for officer safety purposes, to direct the Defendants where to sit.  None of the agents touched the Defendants, spoke in a threatening or menacing tone, or brandished their weapons.  Similarly, the agents did not verbally or physically intimidate the Defendants or indicate that their compliance was compulsory.  The agents did not prolong the encounter—indeed, events proceeded relatively quickly.  There is no evidence that the Defendants were susceptible to coercion because of their age, intelligence, or education.  And, as the Government points out, upon inquiry by Agent Martinez, the Defendants  initially denied that there were any drugs in the house, which tends to belie their assertion that they felt that they had no choice but to answer Martinez' questions or to consent to a search by the agents.

In addition, the Court disagrees with Defendants that Villalobos' use of the word "pasalo," meaning "pass through," and his sweeping arm motion toward the rest of the house—both uttered in response to Martinez' question to Defendants about whether there were drugs in the house—was nonresponsive, demonstrating that Villalobos did not understand Martinez' question and therefore

11

did not knowingly consent to a search.  Defendants' interpretation is undermined by several factors.

First, while Villalobos' response is not a simple yes or no response to Martinez' question, given the

context of the discussion that fact does not necessarily indicate to the Court that he did not

understand the question.  An equally reasonable interpretation is that Villalobos did not want to

answer yes or no to such an incriminating question, and therefore opted instead to invite Martinez

to take a look around.  Second, Martinez testified that he spoke to the Defendants in Spanish, and

Villalobos testified that while some of Martinez' Spanish was strange to him, he did not have trouble

understanding Martinez.  (Ponce did not testify that he did not understand Martinez' Spanish.)

Third, after Villalobos said "pasalo," Agent Martinez did not immediately start a search of the

house.  Instead, he asked Villalobos himself to retrieve any drugs.  In response, Ponce said to

Villalobos, "enseñalo," or "show him."   Again, this indicated both an understanding of what

Martinez was asking them to do and Defendants' acquiescence to the request.

   After weighing all of the foregoing factors, the Court concludes that Defendants' decision

to show the agents where the box in the kitchen cabinet where they were storing some drugs and

currency was not coerced, but voluntary.  Accordingly, the Court concludes that at that point, with

the discovery of the box containing what appeared to be cocaine and currency, as well as Martinez'

observations of drug packaging materials on the kitchen counter, the agents had probable cause to

arrest the Defendants and search their home.

   Finally, the Court bases its ruling on the alternative grounds that the physical evidence seized

by the agents "ultimately or inevitably would have been discovered by lawful means."  *Nix v.*

*Williams*, 467 U.S. 431, 443-44 (1984).  Specifically, the Court agrees that in light of the consent

that Villalobos gave to Martinez to search the house, the agents would have inevitably discovered

the drugs, currency, scales, packaging materials, and other physical evidence.[3]  These items were concealed in kitchen cabinets, food containers, closets, and other such places where drugs are often hidden and where the agents are trained to search, and therefore the Court concludes that the agents would have found this evidence pursuant to a consent search.

Therefore, the physical evidence found as a result of the search of Defendants' home is not the fruit of the poisonous tree and will not be suppressed.

## III.   VIOLATION OF FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

Next, Defendants move to suppress all statements they made to law enforcement officers, both at their home and at the police station.  Defendants argue that as soon as the police entered the house they were subjected to improper custodial interrogation, and that the violation of their Fifth Amendment rights at their home tainted the additional questioning that took place at the police station.

The Fifth Amendment to the U.S. Constitution guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Statements obtained during a custodial interrogation may not be used against a defendant unless the government demonstrates that he was informed of certain rights mandated by the Supreme Court's decision in *Miranda*.  *See United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008).[4]  Under *Miranda*, a

_____

[3] The Government also argues that the physical evidence seized at Defendants' home is subject to two additional exceptions to the exclusionary rule, including independent source and attenuation of the taint.  Having concluded that the evidence should not be excluded, the Court need not address these arguments.

[4] Notably, the Supreme Court has held that unlike evidence obtained through a Fourth Amendment violation, the *Miranda* presumption does not require that the "fruits [of unlawfully

suspect's statements are generally inadmissible if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver. 384 U.S. at 444, 478-79. Police must advise suspects of their *Miranda* rights prior to custodial interrogation. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. "The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Finally, it is the Government's burden to show, by a preponderance of the evidence, that a confession was voluntary. *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).

A. **Questioning at Defendants' Home**

The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The determination of custody is based on the totality of the

---

obtained confessions] be discarded as inherently tainted." *Elstad*, 470 U.S. at 307. Indeed, the Supreme Court has rejected automatic application of the "fruits" doctrine to violations of the *Miranda* rule on several occasions. *See Missouri v. Seibert*, 542 U.S. 600, 619 (2004) (Kennedy, J., concurring) (stating that "the scope of the *Miranda* suppression remedy depends on a consideration" of whether the central concerns of Miranda are implicated as well as the objectives of the criminal justice system). For example, the prosecution is still permitted to use statements taken in violation of *Miranda* for impeachment purposes on cross-examination, *see Harris v. New York*, 401 U.S. 222 (1971); the prosecution may still introduce testimony of a third party whose whereabouts were determined through statements obtained in violation of *Miranda*, *see Michigan v. Tucker*, 417 U.S. 433 (1974); and the prosecution may still introduce physical evidence seized as a result of a *Miranda* violation, *see United States v. Patane*, 542 U.S. 630 (2004). Notably, the Supreme Court has also declined to apply the "fruits" doctrine to analyze the admissibility of a subsequent warned confession that followed an earlier violation of *Miranda*. *See Elstad*, 470 U.S. 298.

circumstances, and can include the following non-exhaustive factors: (1) the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will; (2) the nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave; and (3) whether police dominate the encounter. *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008). Additionally, there are many subfactors a court may consider to determine whether police dominate the encounter: (1) separation of the suspect from family or colleagues who could offer moral support; (2) isolation in nonpublic questioning rooms; (3) threatening presence of several officers; (4) display of a weapon by an officer; (5) physical contact with the subject; and (6) an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled. *Id*.

It is undisputed that defendants were never *Mirandized* prior to being questioned at their home. Thus, the relevant question is at what point did the police have the Defendants in custody for purposes of *Miranda*. Defendants argue that they were in custody in their home from the moment police entered, and that the statements they gave to officers prior to receiving their *Miranda* warnings—including consent to search the house—were coerced and involuntary. The Government, in turn, argues that while in their home the Defendants were not in police custody for purposes of *Miranda*. For the reasons discussed above, the Court concludes that the Defendants were not in custody prior to being handcuffed, and that until that point the situation remained a consensual encounter.

However, once the agents placed handcuffs on Defendants, they were no longer free to leave and their freedom of movement was substantially restricted. Thus, the Court concludes that the Defendants were in custody from the time that the police placed them in handcuffs, and at that point

police were required to inform them of their *Miranda* rights prior to questioning them.  However, the agents failed to do so.  Instead, they interrogated the Defendants about how long they had been selling drugs and how much they had sold per week, thereby inducing the Defendants to incriminate themselves.  Accordingly, all evidence of the statements that Defendants made in their home after they were placed in handcuffs must be suppressed.

### B.    Questioning at the Police Station

Defendants further argue that their statements at the police station, where they received *Miranda* warnings, were both involuntary and tainted by the earlier violation, and therefore also should be suppressed.   To determine whether a post-*Miranda* statement is admissible when the suspect previously gave an unwarned statement, the Tenth Circuit applies *Missouri v. Seibert*, 542 U.S.  (2004), and *Oregon v. Elstad*, 470 U.S. 298 (1985).  In *Seibert*, the Supreme Court was unable to reach a majority decision.  Thus, there are two separate tests in *Seibert*—one generated by the plurality opinion, and the other by Justice Kennedy's concurrence.[5]

### 1.    *Seibert* plurality

In *Seibert*, the plurality held that "[t]he threshold inquiry when interrogators question first and warn later is . . . whether it would be reasonable to find that . . . the warnings could function

---

[5] In *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150-51 (10th Cir. 2006), the Tenth Circuit discussed the various opinions in *Seibert* at length, including the difficulty of determining the holding of the Supreme Court in light of the fractured nature of the Justices' conclusions.  Ultimately, the court in *Carrizales-Toledo* concluded that it need not determine what the holding of *Seibert* was because it would affirm the denial of the defendant's motion to suppress under both the plurality opinion and Justice Kennedy's concurring opinion.  *Id.* at 1151. It appears that in the years since *Carrizales-Toledo*, the Tenth Circuit has not confronted the issue.  *See, e.g., United States v. Crisp*, 371 Fed. Appx. 925, 2010 WL 1274223 (10th Cir. April 5, 2010) (unpublished) (declining to determine the central holding of *Seibert* and instead analyzing the case according to both the plurality and concurring opinions, as well as *Elstad*). Taking its cue from the Tenth Circuit, this Court will analyze the Fifth Amendment question presented in this case under all three standards.

'effectively' as *Miranda* requires." 542 U.S. at 611-12 (plurality opinion).  The plurality established

five "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective":

> [1] the completeness and detail of the questions and answers in the
> first round of interrogation, [2] the overlapping content of the two
> statements, [3] the timing and setting of the first and the second
> [rounds], [4] the continuity of police personnel, and [5] the degree to
> which the interrogator's questions treated the second round as
> continuous with the first.

*Id*. at 615.  "These factors, all of which concern the relationship between the first and second

interrogations, are intended to aid courts in determining whether an initial, unwarned interrogation

operated to 'thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be

admitted.' " *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150 (quoting *Seibert*, 542 U.S. at

617).

    With regard to the first factor, the completeness and detail of the questions and answers in

the first round of interrogation at the Defendants' home, we have very little information because the

Government did not present the testimony of the officers who performed the initial interrogation,

only Agent Martinez who testified rather vaguely that he overheard some of the fruits of that

interrogation but did not perform the questioning himself.  As the Government bears the burden of

proof on this issue, *see Lopez*, 437 F.3d at 1063, this factor weighs in favor of the Defendants.  With

regard to the overlapping content of the two statements, it appears that the interrogation of the

Defendants at the house overlapped a great deal with the interrogation of Ponce at the police station.

Both times, Ponce was asked how long the Defendants had been selling drugs, and at what rate.

Both times, he told police that Defendants sold about six ounces per week over four months.  Thus,

this factor weighs in favor of Ponce. There seems to be less overlap with the interrogation of

Villalobos at the police station.  According to the evidence before the Court, at the police station

17

Villalobos merely confirmed that he and Ponce were selling cocaine out of their Taos home, and that the money police found was proceeds from those sales.  Therefore, with regard to Villalobos, the second factor weighs in favor of the Government.

The third factor is the timing and setting of the first and second rounds of interrogation.  This factor weighs in favor of the Defendants.  The first round of questioning occurred when the Defendants were handcuffed and in the custody of the state police, including Agent Martinez.  The second round of questioning occurred at most two hours later, a period of time insufficient to aid in dissipating the effects of the earlier violation.  Further, the Defendants remained in police custody the entire time and had no opportunity to meet with an attorney.  The only change that occurred was one of location—from the Defendants' home to the police station.  The fourth factor, continuity of police personnel, also weighs in favor of the Defendants.  The evidence before the Court shows that while all six state police agents were present, Agent Martinez led the "knock and talk" at Defendants' home and performed all the initial communication with the Defendants that eventually led to Villalobos allowing them into the house and showing them where the drugs were hidden.  He also conducted the interrogation of both Defendants at the police station.  Although Agent Martinez, who was busy searching the house and cataloging the evidence, did not question the Defendants at the house regarding their drug trafficking, he was nearby while other agents did so.   The Government, which once again bears the burden to demonstrate voluntariness, has failed to come forward with evidence as to which agents actually questioned the Defendants at the house, and whether or not those same agents were present with Martinez when he interrogated the Defendants at the police station.  Finally, the fifth factor also weighs in favor of the Defendants.  There is no appreciable evidence in the record regarding the degree to which Martinez' questions at the police station treated that interrogation as continuous with the questioning at Defendants' home.  Thus,

18

under the *Seibert* plurality opinion, Defendants' statements should be suppressed.

### 2.    *Seibert* **concurrence**

Under the narrower *Seibert* concurring opinion, Justice Kennedy proposed an intent-based test that would apply only when "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id*. at 622 (Kennedy, J., concurring). "When an interrogator uses this deliberate, two-step strategy, ... postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id*. at 621. If the interrogator has not deliberately violated *Miranda*, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id*. at 622, 124 S.Ct. 2601.

Once again, the Court lacks evidence upon which to make this determination because the Government, which bears the burden to demonstrate voluntariness, has failed to provide it. The agents who conducted the custodial interrogation of the Defendants in their home did not testify at the hearing, and Agent Martinez testified only that he was vaguely aware of that questioning, though he did not direct his colleagues to conduct an interrogation. Therefore, the Court has no way to determine whether those unknown agents deliberately violated *Miranda*. In the absence of such evidence, the Court must presume that the agents did act "in a calculated way to undermine the *Miranda* warning." Thus, the Court need not take the next step of analyzing the interrogation under the principles of *Elstad*, because under the *Seibert* concurrence the statements should be suppressed.


**IT IS THEREFORE ORDERED** that *Defendants' Joint Motion to Suppress Evidence* [Doc. No. 32] and *Defendants' Joint Motion to Suppress Evidence for Violation of Their Rights Under the Fourth Amendment* [Doc. No. 38] are **GRANTED IN PART** and **DENIED IN**

**PART** as follows.  The physical evidence found as a result of the search of Defendants' home will not be suppressed, but all of Defendants' statements made in response to questions from police after they were placed in handcuffs will be suppressed.

      **IT IS SO ORDERED**.

                                   **UNITED STATES DISTRICT JUDGE**